Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| **DEPARTAMENTO DE RECURSOS NATURALES Y AMBIENTALES (DRNA)**<br><br>**Parte recurrida**<br><br>**v.**<br><br>SUPER JUNKER CAROLINA, INC. h.n.c. SUPER JUNKER CAROLINA Y RECICLAJE<br><br>**Parte recurrente**<br><br>**ASOCIACIÓN DE RESIDENTES DE LA URBANIZACIÓN PASEO DE LA ALHAMBRA ("ARPA), DAVID RODRIGUEZ DIAZ, DAVID RODRIGUEZ HERNÁNDEZ, BRENDA APONTE TOSTE, JOMARY TORRES MERCED Y SANDRA PARDO MONTALVO**<br><br>**Parte interventora Recurrente** | **TA2025RA00372** | **REVISIÓN ADMINISTRATIVA** Procedente del Departamento de Recursos Naturales y Ambientales<br><br>Caso Núm.:<br><br>**24-253**<br><br>Sobre:<br><br>**CESE Y DESISTA** |

Panel integrado por su presidente, el Juez Sánchez Ramos, la Jueza Romero García y el Juez Pérez Ocasio.

Pérez Ocasio, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 20 de enero de 2026.

Comparece ante nos la Asociación de Residentes de la Urbanización Paseo de la Alhambra, en adelante, ARPA o recurrente, solicitando que revisemos la *"Resolución y Notificación"* del Departamento de Recursos Naturales y Ambientales, en adelante, DRNA o recurrido, del 9 de octubre de 2025. En la misma, se acogió una *"Estipulación"* en la que no participó la parte recurrente.

Por los fundamentos que expondremos a continuación, *revocamos* el dictamen recurrido.

**I.**

La urbanización representada por la parte recurrente, que ubica en el Municipio de Carolina, colinda con el Super Junker Carolina, en adelante, Junker.[1] El 13 de septiembre de 2024, la ARPA y su representación legal de la Clínica de Asistencia Legal de la Escuela de Derecho de la Universidad de Puerto Rico se reunieron con el Subsecretario del Departamento de Recursos Naturales y Ambientales, en adelante, DRNA.[2] En la mencionada reunión, la ARPA explicó cómo la salud y propiedad de la comunidad en la urbanización ha sido afectada por la operación impropia del Junker.

El 1 de octubre de 2024, mediante una misiva preparada por su representación legal, la recurrente le solicitó al DRNA que hiciera valer sus leyes y reglamentos en pro del bienestar de la ARPA, e interviniera con el Junker.[3] En consecución, el DRNA presentó una *"Querella"* contra el Junker el 30 de octubre de 2024.[4] En la misma, la Agencia recurrida ordenó al Junker que corrigiera una serie de deficiencias señaladas en la *"Querella"*, y obtuviera una serie de permisos con los que, al momento, no contaba.[5]

Por su parte, la ARPA presentó una *"Solicitud de Intervención"* al DRNA el 14 de noviembre de 2024.[6] Solicitaron participar del proceso administrativo contra el Junker, alegando que *poseen un interés legítimo en el pleito* y su resolución. Para ello, citaron disposiciones estatutarias y jurisprudenciales que, a la luz de su posible aportación en la querella, justifican su intervención. También, añadieron que la Representación Legal del Interés Público

---

[1] Apéndice del recurso, Anejo 3.
[2] *Id.*
[3] *Id.*
[4] *Id.*, Anejo 1.
[5] *Id.*
[6] *Id.*, Anejo 4.

indicó que no tenía objeción con su intervención en el caso. Así las cosas, el 20 de noviembre de 2024, el DRNA emitió una orden *autorizando la intervención* solicitada.[7] Ese mismo día se celebró una vista administrativa a la que comparecieron las partes. En la mencionada vista, el Oficial Examinador del DRNA ordenó el cese inmediato de las operaciones del Junker.[8]

Sin embargo, el 26 de noviembre de 2024 la ARPA radicó una *"Moción Urgente Informativa y Solicitando Remedios"*, en la que adujo que el Junker no había cumplido con lo ordenado por el DRNA.[9]

Más adelante, el 5 de marzo de 2025, el DRNA aprobó un plan de cumplimiento, con miras a cumplir con los requisitos que estableció la Agencia para la remoción, manejo y disposición final de los desperdicios sólidos no peligrosos del Junker.[10]

Surge, además, que a finales del mismo mes, la parte interventora y la Representación del Interés Público, señalada por el DRNA, se reunieron con el Junker para inspeccionar los predios. Mediante moción, la ARPA informó sus observaciones – incluyendo los adelantos en la limpieza – y sus demandas al respecto del trabajo que resta.[11]

Posteriormente, el 25 de abril de 2025, se celebró una vista en la que comparecieron las partes, y dejó sin efecto el cese y desista que ordenó en noviembre del año 2024. Esto último, sujeto a que la recurrida limitara sus operaciones a lo autorizado por la Agencia recurrida.[12] Así las cosas, se pautó vista de seguimiento para el 27 de junio de 2025.

Sin embargo, el 9 de junio de 2025, la ARPA radicó ante el DRNA una *"Moción Informativa sobre Violaciones y Solicitud de*

---

[7] Apéndice del recurso, Anejo 5.
[8] *Id.*, Anejo 6.
[9] *Id.*
[10] *Id.*, Anejo 7.
[11] *Id.*, Anejo 8.
[12] *Id.*, Anejo 9.

*Remedios (25 de abril – 2 de junio de 2025)".*[13] La Agencia recurrida emitió una *"Orden y Notificación del 13 de junio de 2025"* reestableciendo la orden de cese y desista de las operaciones del Junker.[14]

Llegado el día pautado para la vista de seguimiento, comparecieron las partes del caso y se presenta un *"Informe de Inspección"* del 26 de junio de 2025. ARPA expresó que la recurrida incumplió con los acuerdos establecidos para las operaciones del Junker. No obstante, el DRNA volvió a dejar sin efecto el cese y desista, por lo que la ARPA solicitó reconsideración. Por su parte, la Agencia recurrida declaró la misma *"No Ha Lugar"*, y apercibió al Junker que debe cumplir con lo acordado. Finalmente, señaló vista en su fondo para el 12 de septiembre de 2025.[15]

Sin embargo, el 25 de septiembre de 2025, la Represente Legal del Interés Público radicó una *"Moción Informativa de Estipulación",* en la que informó que ella y el Junker habían alcanzado un acuerdo, con el fin de dar por terminado el proceso administrativo en contra de la parte recurrida.[16] A su moción anejó la *"Estipulación"* entre estos. Según el documento, la recurrida demostró "a satisfacción del interés público que tomaron medidas inmediatas y presentó una evidencia con un plan de cumplimiento, informes de progreso y fotos con la explicación de la limpieza y remoción de los desperdicios sólidos no peligrosos que se realizó en la instalación objeto de la Querella".[17] Además, el Junker aceptó haber infringido las reglas del *Reglamento para el Manejo de los Desperdicios Sólidos No Peligrosos,* Reglamento Núm. 5717 y el *Reglamento para el Manejo Adecuado de Neumáticos,* Reglamento Núm. 8097. Por ello, aceptó pagar en concepto de "transacción y pago de multa la suma total y global de

---

[13] *Id.*, Anejo 12.
[14] Apéndice del recurso, Anejo 13.
[15] *Id.*, Anejo 14.
[16] *Id.*, Anejo 16.
[17] *Id.*, pág. 5.

mil quinientos dólares ($1,500.00). La presente estipulación incluye los gastos y costas incurridas por el DRNA relacionadas con la *"Querella"* y este procedimiento".[18]

Del expediente se desprende que el 29 de septiembre de 2025, el Oficial Examinador del caso de epígrafe recomendó que el DRNA acoja la *"Estipulación"*.[19]

Por su parte, la ARPA presentó una *"Moción en Oposición a Acuerdo de Estipulación"* ante el DRNA el 2 de octubre de 2025.[20] En síntesis, la recurrente arguyó que la *"Estipulación"* debía ser denegada por el DRNA, ya que los suscribientes no contaron con la parte interventora del caso para llegar al acuerdo. En respuesta, la Agencia recurrida emitió una *"Orden y Notificación del 3 de octubre de 2025"*, que declaró *"No Ha Lugar"* la oposición de la ARPA, y razonó que "[u]na parte interventora no tiene derecho a participar en la negociación de la imposición de una sanción o penalidad administrativa a una parte querellada. Ello es facultad exclusiva de la agencia administrativa".[21]

Posteriormente, el 9 de octubre de 2025, el DRNA notificó una *"Resolución y Notificación"*, en la que acogió la *"Estipulación"* entre el Junker y el Representante Legal del Interés Público.[22] El 23 de octubre de 2025, la recurrente solicitó reconsideración,[23] la cual fue declarada *"No Ha Lugar"* el 28 de octubre de 2025.[24]

Inconforme con este resultado, la ARPA radicó ante esta Curia un recurso de *"Revisión Administrativa"* el 27 de noviembre de 2025, en el que hizo los siguientes señalamientos de error:

> PRIMER ERROR: **Erró el Departamento de Recursos Naturales y Ambientales al emitir una Resolución que no atiende los reclamos de la parte interventora**

---

[18] Apéndice del recurso, pág. 6.
[19] *Id.*, Anejo 2.
[20] *Id.*, Anejo 17.
[21] *Id.*, Anejo 18.
[22] *Id.*, Anejo 2.
[23] *Id.*, Anejo 19.
[24] *Id.*, Anejo 20.

**ni provee un remedio efectivo que proteja a los vecinos.**

SEGUNDO ERROR: **Erró el Departamento de Recursos Naturales y Ambientales al excluir a la parte interventora de participar en el proceso de negociación de las estipulaciones.**

Mediante *"Resolución"* del 5 de diciembre de 2025, concedimos a la parte recurrida hasta el 29 de diciembre de 2025 para presentar su posición en torno al recurso, en conformidad a la Regla 63 del Reglamento del Tribunal de Apelaciones, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, pág. 83-84, 215 DPR ___ (2025). Llegado el día establecido, el DRNA presentó su *"Escrito en Cumplimiento de Resolución"*. Así, perfeccionado el recurso ante nuestra consideración, procedemos a resolver.

## II.

### A. Revisión Judicial de Decisiones Administrativas

La revisión judicial permite a los tribunales garantizar que las agencias administrativas actúen dentro de los márgenes de las facultades que le fueron delegadas por ley. A su vez, posibilita el poder constatar que los organismos administrativos "cumplan con los mandatos constitucionales que rigen el ejercicio de su función, especialmente con los requisitos del debido proceso de ley". *Tricoche Matos y otro v. Luis Freire*, 2025 TSPR 92, 216 DPR ___ (2025); *Vázquez et al v. DACo,* 2025 TSPR 56, 215 DPR ___ (2025); *Simpson, Passalaqcua v. Quirós, Betances*, 214 DPR 370, 377 (2024); *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* 213 DPR 743, 754 (2024); *Comisión Ciudadanos v. G.P. Real Prop.,* 173 DPR 998, 1015 (2008). De esta forma, se vela por que los ciudadanos tengan "un foro al cual recurrir para vindicar sus derechos y obtener un remedio frente a las actuaciones arbitrarias de las agencias". *Id.*

En términos simples, la revisión judicial constituye "el recurso exclusivo para revisar los méritos de una decisión administrativa

sea ésta de naturaleza adjudicativa o de naturaleza informal". *Simpson, Passalaqcua v. Quirós, Betances*, supra; *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, pág. 753; *Depto. Educ. v. Sindicato Puertorriqueño*, 168 DPR 527, 543 (2006); Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, en adelante, LPAUG, Ley 38-2017, 3 LPRA sec. 9672. La precitada Ley es la que autoriza la revisión judicial de las decisiones de las agencias administrativas. *J.H.V. v. Negociado de la Policía*, 2025 TSPR 139, 216 DPR ___ (2025); *OEG v. Martínez Giraud*, 210 DPR 79, 88 (2022); LPAUG, supra, secs. 9671-9677.

Ahora bien, es harto conocido en nuestro ordenamiento jurídico, que los tribunales deben brindarles la mayor deferencia posible a las decisiones administrativas, por gozar estas de una presunción de validez proveniente de la experiencia que se le atribuye a las mismas. *Katiria's Café, Inc. vs. Mun. San Juan,* 2025 TSPR 33, 215 DPR ___ (2025); *Transp. Sonell, v. Jta. Subastas ACT*, 214 DPR 633, 648 (2024); *Otero Rivera v. USAA Fed. Savs. Bank*, 214 DPR 473, 484 (2024); *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99, 114 (2023); *OEG v. Martínez Giraud,* supra, pág. 89; *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garage Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018). Al ejercer la revisión judicial, los tribunales no pueden descartar de forma absoluta la determinación de una agencia, sino que primero deben examinar la totalidad del expediente y determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa. *Voilí Voilá Corp. et al. v. Mun. Guaynabo,* supra, pág. 754; *Otero v. Toyota,* 163 DPR 716, 729 (2005).

Esto es así, toda vez que las determinaciones de los organismos administrativos están revestidas de una presunción de regularidad y corrección debido a su vasta experiencia y conocimiento especializado, lo que significa que estas merecen deferencia por parte de los foros judiciales. *Transp. Sonell v. Jta. Subastas ACT*, supra; *Otero Rivera v. USAA Fed. Savs. Bank*, supra, pág. 484; *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, supra, pág. 754; *OEG v. Martínez Giraud*, supra, pág. 89; *Super Asphalt v. AFI y otro*, supra, pág. 819; *Graciani Rodríguez v. Garage Isla Verde*, supra, pág. 126; *Rolón Martínez v. Supte. Policía*, supra, pág. 35.

En cuanto a las determinaciones de hechos formuladas por las agencias administrativas, la LPAUG, *supra*, establece que serán sostenidas si están basadas en evidencia sustancial contenida en el expediente administrativo. LPAUG, *supra*, sec. 9675. Así, la parte que impugna las determinaciones de hechos de una agencia tiene que demostrar que el dictamen administrativo no está justificado por una evaluación justa del peso de la prueba que tuvo ante su consideración. *Hernández Feliciano v. Mun. Quebradillas*, supra, pág. 114; *OEG v. Martínez Giraud*, supra, págs. 88-89; *Capó Cruz v. Jta. Planificación et al.*, 204 DPR 581, 591 (2020); *Graciani Rodríguez v. Garaje Isla Verde*, supra, pág. 128; *Rebollo v. Yiyi Motors*, 161 DPR 69, 77 (2004).

Por su parte, la LPAUG, *supra*, sec. 9675 dispone que "[l]as determinaciones de derecho pueden ser revisables en todos sus aspectos por el tribunal". *Rolón Martínez v. Supte. Policía*, supra, pág. 36. Esta máxima está impregnada en la fábrica del derecho anglosajón, que en virtud de nuestra fusión jurídica con los Estados Unidos de América nos aplica, desde el famoso caso *Marbury v. Madison*, 5 US 137 (1803), en el que se estableció que "determinar cuál es el derecho es, categóricamente, el ámbito y el deber del poder judicial".

A esos efectos, nuestro Tribunal Supremo aclaró recientemente que, a través de la precitada disposición en la LPAUG, supra, el legislador eliminó la deferencia judicial sobre las determinaciones de derecho que realicen las agencias administrativas. *Vázquez et al. v. DACo,* supra. Lo cierto es que "la interpretación de la Ley es una tarea que corresponde inherentemente a los tribunales". *Vázquez el at. v. DACo,* supra.

Así, la revisión administrativa está limitada a determinar si hay evidencia sustancial en el expediente para sostener la conclusión de la Agencia o si esta actuó de forma arbitraria, caprichosa o ilegal. *Moreno Lorenzo y otros v. Depto. Fam.*, 207 DPR 833, 839 (2021).

### B. Figura del Interventor

La intervención "es el mecanismo procesal para que una persona que no fue parte original en un procedimiento pueda defenderse de la determinación administrativa". *JP, Plaza Santa Isabel v. Cordero Badillo,* 177 DPR 177, 189 (2009); *Asoc. Residentes v. Montebello Dev. Corp.,* 138 DPR 412, 420 (1995). La *parte interventora* está definida por la Sección 1.3(f) de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, en adelante, LPAUG, Ley 38-2017, 3 LPRA sec. 9603 como "aquella persona que no sea parte original en cualquier procedimiento adjudicativo que la agencia lleve a cabo y que haya demostrado su capacidad o interés en el procedimiento".

Sobre la solicitud de intervención en un procedimiento adjudicativo, la Sec. 3.5 de la LPAUG, en lo pertinente, dispone:

> Cualquier persona que tenga un ***interés legítimo*** en un procedimiento adjudicativo ante una agencia podrá someter una solicitud por escrito y ***debidamente fundamentada*** para que se le permita intervenir o participar en dicho procedimiento. La agencia podrá conceder o denegar la

solicitud, a su discreción, tomando en consideración entre otros los siguientes factores:

(a) Que el interés del peticionario pueda ser afectado adversamente por el procedimiento adjudicativo.

(b) Que no existan otros medios en derecho para que el peticionado pueda proteger adecuadamente su interés.

(c) Que el interés del peticionario ya esté representado adecuadamente por las partes en el procedimiento.

(d) Que la participación del peticionario pueda ayudar razonablemente a preparar un expediente más completo del procedimiento.

(e) Que la participación del peticionario pueda extender o dilatar excesivamente el procedimiento.

(f) Que el peticionario represente o sea portavoz de otros grupos o entidades de la comunidad.

(g) Que el peticionario pueda aportar información, pericia, conocimientos especializados o asesoramiento técnico que no estaría disponible de otro modo en el procedimiento.

(Énfasis nuestro).  3 LPRA sec. 9645.

Resulta importante destacar que nuestro Tribunal Supremo ha consignado que una parte interventora disfruta de los mismos derechos y obligaciones que una parte original en el pleito. A esos efectos, expresó que la LPAUG, supra, elevó los interventores a "calidad de parte una vez se le reconozca como tal […]". *San Antonio Maritime v. P.R. Cement Co.*, 153 DPR 374, 391 (2001). Además, nuestra jurisprudencia ha reiterado la normativa estatutaria que reconoce como "parte" en un pleito a "las personas cuyos derechos y obligaciones puedan verse adversamente afectados por la acción o inacción de la agencia y que, a su vez, participan activamente en los procedimientos administrativos". *Lugo Rodríguez v. J.P.,* 150 DPR 29, 43 (2000). Véase, además, *JP, Plaza Santa Isabel v. Cordero Badillo,* supra, pág. 188. Así, está estatutariamente establecido que las partes son "el promovido, el promovente y *el interventor*

*designado como tal en el procedimiento administrativo*". *Junta Dir. Portofino v. P.D.C.M.*, 173 DPR 45, 471 (2008).

Si bien es cierto "que existen circunstancias 'en las que la determinación de quién es parte en un proceso administrativo resulta una labor compleja'", nuestra jurisprudencia ha desarrollado los contornos del actor interventor en los procesos adjudicativos de naturaleza administrativa. *JP, Plaza Santa Isabel v. Cordero Badillo,* supra, pág. 188, citando a *Rivera v. Morales*, 149 DPR 672, 683 (1999). Con respecto a la figura del interventor, nuestra Alta Curia ha aclarado, incluso, que una persona no tiene que solicitar intervención para ser considerada 'parte'" puesto que "[b]asta con tener interés en el procedimiento, comparecer a las vistas para oponerse o demostrar su interés en formar parte del mismo". *Lugo Rodríguez v. J.P.,* supra, pág. 44. Véase, además, *Rivera v. Morales*, supra.

Como corolario de lo anterior, nuestro más Alto Foro ha evaluado la distinción *a priori* entre las partes no interventoras que participan activamente de los procesos y aquellas que fungen como meros participantes. Este último lo ha equiparado con la figura del amigo de la corte. *Junta Dir. Portofino v. P.D.C.M.*, supra, pág. 463; *Lugo Rodríguez v. J.P.,* supra, pág. 43. El mero participante "se limita a comparecer a la audiencia pública, sin mayor intervención; o declara en la misma pero no demuestra interés ulterior en el asunto; o únicamente suple evidencia documental; o participa en calidad de *amicus curiae*". *Lugo Rodríguez v. J.P.,* supra, pág. 43. Véase, además, *Junta Dir. Portofino v. P.D.C.M.*, supra, pág. 463.

El participante activo tiene un rol más integral en los procesos administrativos, y "utiliza los remedios disponibles en aras de proteger su interés e interviene de forma tal en el proceso que resultaría injusto y arbitrario no considerarlo una 'parte'". *Lugo*

*Rodríguez v. J.P.,* supra, págs. 43–44. Véase, además, *Junta Dir. Portofino v. P.D.C.M.*, supra, pág. 463.

### i. Intervención administrativa en el DRNA

El Artículo VI, Sección 19 de la Constitución de Puerto Rico, 1 LPRA, consigna que "será política pública del Estado Libre Asociado de Puerto Rico la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad...". Como corolario de lo anterior, la Asamblea Legislativa de Puerto Rico aprobó la Ley Orgánica del Departamento de Recursos Naturales y Ambientales, en adelante, Ley Orgánica del DRNA, Ley Número 23 de 20 de junio de 1972, 3 LPRA, sec. 151 *et seq.* Esta, le impuso al DRNA la responsabilidad de poner en vigor diversos programas para la utilización y conservación de los recursos naturales de Puerto Rico. Ello con el fin de implementar la política pública del Gobierno del Estado Libre Asociado de Puerto Rico estatuida en nuestra Constitución. Con dicho propósito, se le reconoció al Secretario del DRNA la facultad de aprobar, enmendar y derogar reglamentos. Ley Orgánica del DRNA, supra, secs. 153 y 155.

Bajo la antes mencionada autoridad, se aprobó el *Reglamento de Procedimientos Administrativos del Departamento de Recursos Naturales y Ambientales de Puerto Rico,* Reglamento Número 6442 del 26 de abril de 2002, en adelante, Reglamento Núm. 6442. El mencionado cuerpo reglamentario uniforma los procesos administrativos en la agencia recurrida.

Primeramente, huelga destacar las siguientes definiciones que obran en el Artículo 5 sobre definiciones, del Reglamento Núm. 6442, supra:

> **Estipulación:** Documento mediante el cual las partes interesan poner fin a una controversia por acuerdo mutuo y voluntario, sujeto a la aprobación del Jefe de la Agencia

**Interventor:** *significa aquella persona que no sea parte original en cualquier procedimiento adjudicativo que la Agencia lleve a cabo habiendo demostrado su capacidad o interés en el procedimiento.*

**Parte:** significa toda persona o agencia autorizada por ley a quien se dirija específicamente la acción de la Agencia o que sea parte en dicha acción, o que se le permita intervenir o participar en la misma, o que haya radicado una petición para la revisión o cumplimiento de una orden, o que sea designada como parte en dicho procedimiento.

**Representante del Interés Público:** significa el abogado designado por el Secretario para representar al Departamento en los procedimientos administrativos que se ventilen en el Departamento.

(Énfasis suplido).

Ahora bien, en su Artículo 11, el mencionado Reglamento desglosa el proceso para que una parte interesada en un proceso adjudicativo ante el DRNA solicite intervenir en el mismo. Por ser relevante al caso de autos, destacamos que el Reglamento en cuestión establece que **"interventor advendrá una parte igual a las demás si se le concede la solicitud para intervenir"**. Artículo 11.4 del Reglamento Núm. 6442, supra. (Énfasis suplido). Añade, por otro lado, que una parte a la que se le permita intervenir quedará sujeta a los "acuerdos escritos, estipulaciones y todas las órdenes introducidas en el procedimiento ***con anterioridad a la intervención***, salvo que los mismos, por su naturaleza no le sean aplicables o la Agencia lo exima de la aplicación de alguno o algunos de dichos trámites y disposiciones". *Id.* (Énfasis suplido).

**III.**

La parte recurrente sostiene ante nos que el DRNA se equivocó al emitir un dictamen que acogía una *"Estipulación"* entre el Junker y el Representante del Interés Público, sin considerar a la ARPA. Por su estrecho vínculo, discutiremos ambos señalamientos de error en conjunto. En síntesis, la ARPA arguye que el DRNA incurrió en error al excluir a la parte interventora de la resolución de la querella.

Sostiene, además, que sus reclamos no fueron atendidos ni remediados efectivamente. En el caso de marras, este Tribunal está llamado a evaluar, primeramente, si la recurrente es parte interventora en la querella contra el Junker, y si sus derechos como tal fueron violentados. Adelantamos, pues, que contestamos en la afirmativa y entendemos que a la recurrente *le asiste la razón.*

Como explicáramos previamente, la deferencia de los tribunales hacia las agencias administrativas no se otorga en un plano ciego. Como entidad, nuestra función principal es la interpretación del derecho. Por eso, no empese al *expertise* administrativo, ante un recurso de esta naturaleza, debemos evaluar la aplicación del derecho en su totalidad. Es precisamente este ejercicio el que nos mueve hoy a *revocar el dictamen recurrido.*

La figura del interventor es una de las categorías que contempla una "parte" en un proceso administrativo. Una vez la agencia, en este caso el DRNA, acepta su intervención en el pleito, esta adquiere los derechos y obligaciones de las partes originales en proceso adjudicativo. Aclaramos que estas obligaciones no solo precisan responsabilidades por parte del interventor, sino también de la Agencia. Es decir, el interventor tiene el deber de cumplir ante el foro administrativo con las responsabilidades de una parte, y, a su vez, la Agencia tiene el deber de honrar e integrar al interventor como parte en los procesos ante sí.

No albergamos duda que el ARPA es parte interventora en el caso de autos. Primeramente, surge de los documentos que obran en autos que con anterioridad a la *"Querella"* contra el Junker, la ARPA le solicitó al DRNA que interviniera, alegando que las actuaciones de este afectaban la comunidad que representa. Iniciado el pleito contra el Junker, la recurrente solicitó formalmente intervenir el proceso administrativo. Así, mediante orden del 20 de

noviembre de 2024, el DRNA autorizó la intervención solicitada por la ARPA.

Por otro lado, la recurrente participó de las vistas señaladas. Surge también del expediente que la ARPA formó parte de las conversaciones y visitas oculares entre las partes, fiscalizó el progreso de las órdenes de cese y desista y mantuvo a la Agencia recurrida informada sobre los asuntos del caso. Es nuestra apreciación que, además de haber sido una parte interventora formal en el proceso, la ARPA fue participante activa. La jurisprudencia los define como partes que aprovechan los "remedios disponibles en aras de proteger su interés e interviene de forma tal en el proceso que resultaría injusto y arbitrario no considerarlo una 'parte'". *Lugo Rodríguez v. J.P.*, supra, págs. 43–44. A la luz del tracto procesal administrativo, justipreciamos que sería una grave injusticia, para efectos de la resolución de la *"Querella"*, no considerar a la recurrente parte del pleito y de la *"Estipulación"*.

Por otro lado, conviene repasar que, además de la LPAUG, *supra*, y las expresiones de nuestro Tribunal Supremo, el Reglamento Núm. 6442, define lo que es una *"parte"* y un *"interventor"* en un proceso adjudicativo ante el DRNA. Surge de este que la diferencia entre uno y el otro, es que el interventor, como en el caso de autos, no fue parte original. Sin embargo, este demostró su capacidad e interés en participar del mismo. Además, también define *"Estipulación"* como el acuerdo entre las partes para poner fin a una controversia administrativa.

Por su parte, la Agencia recurrida, en su escrito, aduce que para los efectos de una transacción, no es necesario incluir a una parte interventora. Para ello, cita el Artículo 22.1, del Reglamento Núm. 6442, *supra*, que establece que "[e]l querellado podrá discutir con el representante del interés público y con las partes sobre una posible transacción en cualquier etapa del proceso". Es su

contención que este lenguaje "no impone una obligación, sino que le confiere discreción para discutir la posibilidad de alcanzar acuerdos". Entendemos que la misma es una apreciación fragmentada. Si bien es cierto que una parte querellada no está obligada a transar, el artículo citado alude a la posibilidad de considerar un acuerdo. Más aun, consideramos que la Agencia recurrida pasa por alto el resto del artículo, que responsabiliza al querellado de discutir esta posibilidad, no solo con el Representante del Interés Público, sino también con las demás partes del caso. El DRNA tampoco hace alusión al Artículo 22.1(e) del Reglamento Núm. 6442, *supra*, el cual dispone que un "acuerdo de transacción habrá de incluir todos los términos estipulados y deberá ser firmado por las partes pertinentes o sus representantes legales".

Aun si la premisa del análisis de la Agencia recurrida fuese correcta, hacemos eco de las expresiones recientes de nuestro Alto Foro, mediante una sentencia, en la que concluyó que "a pesar de que el término *'podrá'* puede, como norma general, ser catalogado como permisible, esta característica carece de mérito cuando al darle ese significado derrote el propósito del estatuto promulgado". *American Fed. Musicians v. COSPR*, 211 DPR 491, 504 (2023). Es decir, aun si la porción del Reglamento citado hiciera referencia a la responsabilidad de la parte querellada de incluir a las partes en un acuerdo transaccional, a la luz de las expresiones de nuestro más Alto Foro, concluiríamos que la palabra "podrá" no admite discreción en el asunto.

Deseamos, además, atender las expresiones del dictamen recurrido, en la que el DRNA indicó que por ser un asunto de sanciones, la parte interventora no podía participar. Si bien es cierto que en el acuerdo el Junker se obligó a pagar una cantidad en concepto de sanción por incumplimientos con los reglamentos del

DRNA, la finalidad de la *"Estipulación"* – y así lo hicieron constatar – era poner fin al asunto y resolver la *"Querella"*.

Por lo tanto, habiendo establecido que la ARPA es una parte en este caso, erró el DRNA al excluirla del proceso de la *"Estipulación"*. Así, luego de una evaluación sosegada del derecho que encausa la figura del interventor y los matices de la participación del ARPA en el caso de epígrafe, nos vemos obligados a concluir que resulta contrario a derecho que el DRNA admita un acuerdo para resolver la querella sin contar con la participación de la parte interventora recurrente.

**IV.**

Por los fundamentos que anteceden, *revocamos el dictamen recurrido y devolvemos el caso al foro administrativo*, para que los mismos continúen conforme a lo aquí resuelto.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones